IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TOSHIBA CORPORATION,

                                                                        ORDER
                              Plaintiff,

              v.                                                        09-cv-305-slc

IMATION CORP., *et al.*,

                              Defendants.

---

SUPPLEMENTAL ORDER RE: MOTIONS IN LIMINE
_____

At the final pretrial conference on March 28, 2013, the court allowed the parties to

submit supplemental briefs on certain issues that remain in dispute concerning the motions in

*limine*, which were the subject of a written order issued by the court on March 26, 2013.  Having

considered the parties' most recent submissions, along with all the previously-considered

submissions, the court rules on these remaining issues as follows:

I.        **Defendants' Motion to Preclude Dr. Hesselink from Testifying That
          Defendants Knew, "Should Have Known" or Were Willfully Blind as to the
          Patents-in-suit Prior to the Suit**

Defendants argue that Dr. Hesselink should not be allowed to present testimony to the

effect that defendants actually knew or "should have known" about the patents-in-suit prior to

the suit.  As to defendants' actual knowledge of the patents, defendants contend that such

testimony should be excluded because Dr. Hesselink has no basis to offer that opinion, insofar

as he testified that his only evidence of knowledge came from Toshiba's counsel, who told him

that there was correspondence between the patent owner and defendants notifying defendants

about the patents. As for whether defendants "should have known" about the patents,

defendants argue that Dr. Hesselink cannot offer this testimony because the "should have

known" standard is legally incorrect under *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2071 (2011).

As discussed in the previous order on the motions in *limine*, I agree that Dr. Hesselink is not qualified to offer his opinion on the legal issue of the proper level of knowledge required to constitute inducement, nor may he testify on the ultimate issues of what defendants knew or whether they possessed the specific intent necessary to be found liable for inducement. Toshiba, however, does not intend to solicit such testimony from Dr. Hesselink. As Toshiba makes clear in its brief, it intends to have Dr. Hesselink testify about factual matters about which the average juror lacks knowledge (*e.g.* the DVD specifications and how they work) from which knowledge and intent could be *inferred*. Toshiba does not intend to ask Dr, Hesselink questions about or ask him to offer conclusions about defendants' actual mental states.

Having reviewed Toshiba's proffer of Dr. Hesselink's expected testimony, I find that it passes muster under *Daubert*. *Accord Hershey v. Pacific Inv. Management Co. LLC*, 697 F. Supp. 2d 945, 952 (N.D. Ill. 2010) ("[W]hile Mr. Rickards is allowed to present and analyze *facts* indicating manipulation, he may not embrace the ultimate issue of whether Defendant's acts were, indeed, manipulative.") (emphasis in original).

Defendants also object to Dr. Hesselink offering any opinion on whether defendants' actions meet the requirements for "willful blindness" under *Global-Tech*, arguing that Dr. Hesselink has never disclosed any opinion on willful blindness in his expert reports. Again, however, I do not understand Toshiba to be offering Dr. Hesselink for this purpose. Insofar as defendants appear to be suggesting that Toshiba cannot proceed on a willful blindness theory absent expert testimony, I disagree:  like testimony concerning knowledge or intent to induce

infringement, determining whether a defendant "believed that there was a high probability that the acts, if taken, would constitute infringement of the patent but deliberately avoided confirming that belief" is a state-of-mind question within the province of the jury. Accordingly, it was not necessary for Dr. Hesselink to disclose an opinion on this question. Defendants are free to argue at the close of evidence that Toshiba has not adduced sufficient evidence to warrant a willful blindness instruction, but it has not provided a sufficient basis for prophylactically precluding that theory or evidence that would support it.

## II.    Defendants' Proffer Regarding Toshiba's Mil 3 Re: the '966 Patent

This court granted Toshiba's MIL 3, which asked for an order excluding from trial any non-infringement argument or evidence inconsistent with the Federal Circuit's claim construction for the '966 patent, including evidence relating to the operation of bits b6, b5 and b24 in non-accused double-sided discs. At the pretrial conference, defendants asked for permission to make an offer of proof, which they now have done. Having reviewed that proffer, I am not persuaded that it is anything but a cleverly-worded two-sided disc or "purpose" argument, both of which are foreclosed by the Federal Circuit's opinion and my previous ruling. Accordingly, my ruling on Toshiba's MIL 3 stands.

I note, however, that defendants have indicated that they intend to take the position that the accused discs do not infringe the asserted claims of the '966 patent based on the absence of data in the data region. Dkt. 442, at n. 1. Toshiba has responded that, if defendants pursue this defense at trial, then the court will "likely need to address the proper construction of the

claim language in its jury instructions;" Toshiba reserves the right to develop its claim construction position at that time. Dkt. 447, at 5.

Just why Toshiba has continued to wait to develop its claim construction position on this issue is unclear. From the court's perspective, however, waiting to see what happens next no longer is a viable option. If a claims construction dispute exists requiring resolution by the court, then the court wants to know about it *now*, not at the jury instruction phase. Accordingly, any party wishing to have a claim construed must submit that request and proposed construction, with supporting arguments, no later than **4:30 p.m. on Monday, April 8**. Responses will be due on **Wednesday, April 10 at 4:30 p.m**.

### III.    Toshiba's Mil 4 (Liesegang Testimony and Exhaustion Defense)

In the March 26, 2013 order, this court ruled that defendants had not proven to the court's satisfaction that, by licensing the drives that are necessary to write the claimed test pattern on the accused discs, Toshiba had exhausted its rights in the '751 patent. Order, dkt. 417, at 10-12 (discussing *Quanta Computer Inc., v. LG Elec., Inc.*, 553 U.S. 617, 625 (2008)). In light of that ruling, the court asked defendants at the March 28, 2013 final pretrial conference to explain what relevant facts were disputed and in need of a jury decision, and how the defendants envisioned that evidence related to their patent exhaustion defense would be presented to the jury. Defendants have submitted a supplemental brief on that issue, to which Toshiba has responded in opposition.

Although defendants assert that they have a right to present their exhaustion defense to the jury, both parties express a preference that this court decide this question as a matter of law.

4

Defendants say the question can be decided based on facts of record that are not in dispute, namely:  1) the language of the '751 patent, which claims methods of recording onto optical disks, claims the apparati that are used to make such recordings and claims the optical discs themselves, *see* Defs.' Br., dkt. 441, at 3;  2) the fact that the optical discs accused of infringing in this case are blank when sold; and 3) the testimony of *Toshiba's* expert, Dr. Hesselink, who testified that it is when the disc is recorded with a drive that complies with the DVD formats that the disc becomes infringing.  Dkt. 135-1, Hesselink 7/7/2010 Rpt. at ¶182 ("The act of recording data with a drive that complies with the DVD formats will create an optical disk having a lead-in and lead-out area as described by claim 1 of the '751 patent, and a data area including pits and a 3T-6T-7T test pattern as described in claim 1.").  In light of these facts, contend defendants, the only logical conclusion that can be reached is that the drives substantially embody the inventive aspects of the '751 patent.

At the outset, I note that defendants make a persuasive argument that the question whether a product sold pursuant to a license "substantially embodies" the inventive aspects of the patent so as to exhaust the patent holder's rights must be answered by looking to the patent as a whole and not just the claims asserted in the litigation, contrary to this court's suggestion in the previous order.  *See* dkt. 417, at 12 (finding that even if *Quanta* applies, "defendants have not met their burden of showing that the licensed *drives* substantially embody the asserted patent claims, all of which are directed to an "optical disk").  Toshiba does not strongly contest defendants' assertion, nor does it suggest that it has evidence to refute the facts cited by defendants in support of their exhaustion defense.  Instead, Toshiba argues that Dr. Hesselink's testimony is insufficient to show substantial embodiment because he never offered an opinion

whether the drives substantially embody claims 16 or 21 of the '751 patent, which are the method and apparatus claims.   In addition, Toshiba points out that there is no evidence delineating the role of the drives versus the Nero software program used in conjunction with the drives in writing the claimed test pattern that lies at the heart of the '751 patent.

Toshiba's arguments are not particularly persuasive.   I agree with defendants that Dr. Hesselink's testimony–indeed, plaintiff's entire theory of infringement, *i.e.* that the accused discs infringe only after the claimed test pattern is put there by an end user who records data with a drive that complies with the DVD formats–goes a long distance, if not the entire way, to showing substantial embodiment of the inventive aspects of the patent by the drives.  *Accord Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, *6 (D. Del. 2012) ("Given that plaintiff explicitly argues that the method claims at issue are infringed through the use of the patented apparatuses (D.I. 181 at 2), the court has no trouble concluding that use of the brewers embodies the methods at issue.").

At the same time, however, the patent claims do not merely cover the test pattern, they also claim optical discs containing the test pattern.  This fact distinguishes this case from *Keurig*, where the non-Keurig cartridges that were accused of infringing Keurig's brewer technology method patents when they were used in a Keurig brewer were *not* claimed in the patents.  *Id*. at n.2 ("Keep in mind that it is the brewer and the use of the brewer that are claimed, not the cartridge itself.").  Here, the product of using an apparatus that practices the method of writing the test pattern on a disc is a disc containing the test pattern, and Toshiba has been granted a patent on this invention.

The operative question seems to be:  if a patent holder licenses the patented technology that is *used* to create an infringing disc, is does this preclude the patent holder from asserting its patent rights with respect to those discs, where the discs are also claimed in the patent?  None of the cases cited by the parties provides a clear answer to this question.  In the face of this uncertainty, I conclude that the answer is no.  Toshiba was granted a patent monopoly not only in the methods of recording onto optical disks and the apparati that are used to make such recordings, but also for the resulting optical discs themselves.  Defendants have not persuaded this court that it is unfair or contrary to the policies underlying the patent laws to allow Toshiba to collect separate licensing fees for both the drives and the discs.  If presented with this issue, perhaps the Federal Circuit will view the operative question and/or the correct answer differently; if so, then we can revisit this matter with clearer guidance on how to deal with it.  AT this juncture, however, I conclude that, even viewing the evidence in the light most favorable to defendants, they are not entitled to purse their exhaustion defense at trial.

**IV.    Established Royalty Rate and Daubert Motion to Exclude Jarosz**

Toshiba asks the court to reconsider its March 26, 2013 ruling that the established royalty rate is 0.3 cents per disc based on the testimony of Masatsugu Mukuge that plaintiff would be willing to accept that rate to license its patent pool, *see* dkt. 417 at 55.  The parties did not previously brief the issue, but plaintiff now argues that the rate does not meet the criteria for being "established" as set forth by the Supreme Court in *Rude v. Westcott*, 130 U.S. 152 (1889) because this rate was never agreed to or paid by any party.  A more thorough review of

the standard indicates that plaintiff is probably correct.  As a result, the court reverses its ruling

that the rate is 0.3 cents per disc.

That, however, is not the end of it: as defendants note, even if the 0.3 cents per disc rate

is not an established royalty, it is a crucial fact in this case that was not considered by plaintiff's

expert, John Jarosz, in calculating a reasonable royalty rate for the patents-in-suit.

As explained in the previous order on the MILs, *see* dkt. 417 at 54-55, plaintiff's Chief

Specialist in the Licensing & Contract Group has stated that 0.3 cents for recordable discs,

which amounts to approximately 1.7% of sale price, is the "fixed rate" when Toshiba licenses its

recordable disc patents as a whole, *see* dkt. 246 at 50-51.  Jarosz was made aware of the

testimony of Mukuge before Jarosz issued his supplemental report on November 15, 2012.

Jarosz dismissed this testimony as a settlement offer, and therefore irrelevant), without any

further analysis:

> Mr. Bero cited to a 0.3 cents per unit offer made by Toshiba to
> certain of the Defendants in this litigation.  However, it is my
> understanding that Toshiba made this offer only to the
> Defendants as a confidential offer to settle the pending case, and
> that Toshiba has not made this offer to any other parties outside
> of this litigation.  If the court permits Mr. Bero to rely on the
> settlement offer, given the timing and circumstances of the
> settlement offer in relation to the hypothetical negotiation, and
> given the other Market Approach evidence available, the terms of
> the settlement offer are, at most, of limited relevance here.
> Altogether, none of the new information related to the Market
> Approach alters my analysis and conclusions.

Dkt. 355, exh. 1 at 8-9.

Jarosz's incorrect assumption on this point is fatal to his opinion on the reasonable royalty rate,

rendering it unreliable.

Although Toshiba argues that the 0.3 cent rate falls within Jarosz's initial calculations, Jarosz has failed to explain *why* the new data, which might also constitute plaintiff's FRAND rate, does not alter his previous analysis. *See Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560, *5-6 (N.D. Ill. May 22, 2012) ("Remember that 'a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered,' *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), a judge must exclude expert evidence that fails to meet a minimum threshold of reasonableness.").  In order to account for why the 0.3 cents rate is irrelevant, Jarosz necessarily would have to offer opinions about that rate and his own calculations that were not included in his supplemental report.  It is simply too late for him to do so; he will not be allowed to supplement his report a third time at half-past the eleventh hour.  As Judge Posner put it in *Apple*,

> when the plaintiff has done his best to prove damages his inability to dispel uncertainty concerning the accuracy of his claim is not fatal.  But if an expert witness fails to conduct a responsible inquiry that would have been feasible to conduct, his failure cannot be excused by reference to the principle that speculation is permitted in the calculation of damages; that permission presupposes the exhaustion of feasible means of dispelling uncertainty.

*Id.* at *5.

As this court previously found, Jarosz will not be allowed to offer his opinion that the reasonable royalty rate is 2.0% for one patent and 2.5% for two patents.  Nor will this court allow Jarosz to opine that the royalty rate should be another fixed amount because any such new opinion would amount to an untimely disclosure under Fed. R. Civ. P. 26(a)(2).

At the final pre-trial hearing on March 28, 2013, I indicated that Jarosz may be allowed to offer an opinion that the '751 and '966 patents are really important and would command

a higher percentage of the reasonably royalty rate for the patent pool that they are part of. Defendants object to Jarosz providing his opinion with respect to any of the licenses that he examined and they ask that the court exclude Jarosz as a witness altogether because he did not consider the other licenses in conjunction with plaintiff's portfolio license or Mukuge's testimony.  Defendants make a fair point, but this particular concern relates  to the weight, not the reliability of Jarosz's opinion.  To the extent that Jarosz is able to offer a general opinion on his observations regarding related licensing practices without offering his conclusion with respect to a calculation of the reasonable royalty rate, the court will not forbid such testimony at the front end.  Perhaps such testimony would be most relevant in rebuttal to any damages evidence that the defendants choose to offer, but we can determine the contours of any allowable testimony by Jarosz at the outset of the damages phase of this trial, assuming, *arguendo,* that we get there.

To the same effect, defendants raise concerns that Jarosz (1) has stated no means by which he may ascertain the specific value of the patents-in-suit other than to state that they have been deemed "essential" to the DVD standards and (2) has failed to ascertain the amount of infringement that actually has been induced.  Both concerns go to the weight of any opinion that Jarosz may offer about licensing practices and may be explored on cross examination.

## V.      Defendants' Objections Re: Causal Nexus Requirement for Induced Infringement

At the final pretrial conference on  March 28, 2013, defendants objected to this court's proposed jury instruction on induced infringement, arguing that the court's proposed instruction is erroneous because it omits a "causal connection" element.  The court's proposed instruction,

which largely mirrors § 3.2 of the Federal Circuit Bar Association Model Patent Jury

Instructions, reads as follows:

> Plaintiff contends that each defendant induced people using their
> recordable and rewritable DVD disc products (we will refer to these
> people as "end users") to infringe claims 1, 2 and 4 of the '751 patent
> and claim 1 of the '966 patent.  To succeed on these contentions,
> plaintiff must prove each of the following by a preponderance of the
> evidence on a claim-by-claim and defendant-by-defendant basis:
>
> > (1)     The acts are actually carried out by end users and
> >         directly infringe the claim.  I have previously defined
> >         for you what it means to directly infringe a claim;
>
> > (2)     The defendant you are considering took action during
> >         the time the '751 and '966 patents were in force
> >         intending to cause the infringing acts by the end users;
> >         and
>
> > (3)     The defendant you are considering was aware of the
> >         patent and knew that the acts, if taken, would
> >         constitute infringement of that patent or believed that
> >         there was a high probability that the acts, if taken,
> >         would constitute infringement of the patent but
> >         deliberately avoided confirming that belief.
>
> In order to establish inducement of infringement, it is not sufficient
> that the end user directly infringes the claim.  Nor is it sufficient that
> the defendant was aware of the acts by the end user that allegedly
> constitute the direct infringement.  Rather, to find inducement of
> infringement, you must find that the defendant you are considering
> specifically intended the end user to infringe the patent or believed
> that there was a high probability that the end user would infringe the
> patent but remained willfully blind to the infringing nature of the end
> user's acts.

At the final pretrial conference, defendants argued that the law requires an additional

requirement, namely that "the end users infringed because of the encouraging actions that the

defendant took." Defs.' Proposed JI, dkt. 397, at 25.  Defendants asked for clarification on this

point insofar as they intend to refer to the elements of induced infringement in their opening

statements and presentation of evidence.  Tr. of Final Pretrial Conf., dkt. 438, at 22.   Although the court indicated that it was unnecessary to resolve this matter conclusively until the close of trial, prudence suggests that we resolve this issue before anyone over-commits during an opening statement or when questioning the witnesses.

Although the court did not rule specifically on defendants' proposed jury instruction, the causal nexus issue was raised by the defendants as part of their *Daubert* motion to exclude the testimony of plaintiff's expert, Dr. Hesselink.  Specifically, defendants argued that Hesselink's testimony should be excluded because he failed to offer evidence of how many end users finalized discs *because of* defendants' allegedly encouraging statements.   In rejecting that argument, I explained that I had found no support in the case law for defendants' contention that a direct "causal nexus" requirement is an element plaintiff must show to establish liability, although its failure to adduce such proof could bear on damages.  Order on Motions in Limine, dkt. 417, at 52-53.

At the final pretrial conference, defendants argued that their position is supported by *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (*en banc*). *Akamai* is not directly on point:  the question before the court in that case was whether a party can be liable for induced infringement based upon acts committed by various other actors, none of whom directly infringes but whose conduct, when combined with that of other actors, results in direct infringement of the patent.  The question whether induced infringement requires the patent holder to show that the actors performing the direct infringement were actually motivated to do so by the accused infringer's actions or statements was not at issue in the case.

Nonetheless, defendants divine support for their position from the following statement from the court's opinion: "An important limitation on the scope of induced infringement is that inducement gives rise to liability only if the inducement *leads to* actual infringement." *Id.* at 1308 (emphasis added). This sentence, like defendants' citation in their previous brief to *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) (noting that party who takes affirmative steps to foster infringement is liable for *resulting* acts of infringement by third parties) (emphasis added), arguably *alludes* to causation. Other than these allusions, however, this court has not found any case plainly stating that causation is an additional element that a plaintiff must prove to establish liability for induced infringement.

It was not mentioned in the Federal Circuit's opinion in this case, nor does such a requirement appear in the 2012 version of the Federal Circuit Bar Association Model Patent Jury Instructions, upon which this court's proposed instruction is based. Also, other statements in *Akamai* are consistent with the view that liability for inducement does not require proof of a specific causal bridge:

> Unlike direct infringement, induced infringement is not a strict liability tort; it requires that the accused inducer act with knowledge that the induced acts constitute patent infringement. *See Global–Tech Appliances, Inc. v. SEB S.A.*, —— U.S. ——, 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011). In fact, this court has described the required intent as follows: "[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) (internal quotation marks omitted). On the other hand, inducement does not require that the induced party be an agent of the inducer or be acting under the inducer's direction or control to such an extent that the act of the induced party can be attributed to the inducer as a direct infringer. *It is enough that the inducer "cause[s], urge[s], encourage[s], **or** aid[s]" the infringing conduct and that the induced conduct is carried out. Arris Grp., Inc. v. British Telecomms.*

> *PLC*, 639 F.3d 1368, 1379 n. 13 (Fed. Cir.2011); *see also Tegal*
> *Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001);
> *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed.
> Cir. 1996) (analogizing inducement to aiding and abetting
> violations of criminal laws).

*Akamai,* 692 F.3d at 1308 (emphasis added) (footnote omitted).

As the Federal Circuit said in this case, "where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an  infringing way, there is sufficient evidence for a jury to find direct infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012).  Referring to the Federal Circuit's opinion in the order on the motions in *limine*, this court concluded that "if it is not necessary for a patent holder to produce an actual end user who used the accused product in an infringing way, then it would follow that it is also unnecessary to present direct evidence showing an actual end user who infringed as a result of defendants' acts."  Order, dkt. 417, at 46.  Defendants' citation to *Akamai* does not persuade me that this conclusion was incorrect, particularly in light of the Federal Circuit's decision in *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1322, 1333-34 (Fed. Cir. 2009) (affirming jury finding of liability even though record was "conspicuously devoid of any data about how often consumers use the patented date-picker invention," but remanding for new trial on damages).  Accordingly, I affirm my conclusion that "once a plaintiff can show circumstantial evidence of direct infringement and the necessary active inducement by the alleged infringer, the fact and scope of the resulting infringement is a damages issue."  Order, at 52-53.

**VI. Voir dire questions, preliminary jury instructions and opening statements**

Attached for the parties' review are copies of the voir dire questions and the preliminary jury instructions edited to include the changes upon which we agreed at the final pretrial conference. The parties should double-check for implementation.

The court did not set a time limit on the parties' opening statements and I am not setting a firm limit now, but from the court's perspective, an opening around 45 minutes (or shorter) would seem sufficient; if an attorney gets past the one-hour mark, the court will gently ask counsel to wrap it up.

If the openings conclude before 4:30 p.m. on Monday–which seems likely–then Toshiba should be prepared to call its first witness. Whether we start taking evidence between 4:30 and 5:00 is open to discussion on Monday.

Entered this 5th day of April, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

15