IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TOSHIBA CORPORATION,

                      Plaintiff,

     v.

IMATION CORP., *et al.*,

                      Defendants.

OPINION AND ORDER

09-cv-305-slc

---

Following a six-day trial in this patent infringement lawsuit over optical disc technology, the jury found that defendants Imation Corp., Moser Baer India, Ltd., Ritek Corp. and CMC Magnetics Corp. (but not defendants Advanced Media Inc. and Hotan Corp.) induced infringement of Claim 1 of U.S. Patent No. 5,831,966 (the '966 patent) and Claims 1, 2 and 4 of U.S. Patent No. 5,892,751 (the '751 patent). The jury found in favor of all defendants on plaintiff Toshiba Corporation's claim that they directly infringed Claim 1 of the '966 patent and in favor of Toshiba on defendants' counterclaim that the '966 patent is invalid as anticipated by prior art. After the liability verdict, this court granted in part defendants' Daubert motions (dkts. 354 and 440), thereby precluding Toshiba from introducing its evidence with respect to a reasonable royalty rate. As a result, there was no damages phase of the trial.

Thereafter, the parties filed and briefed these post–trial motions, listed by their section numbers in this order:

I.      Toshiba's motion for judgment as a matter of law (JMOL) under Rule 50(b) regarding direct infringement, dkt. 522. (This motion renews Toshiba's initial JMOL filed during trial, dkt. 485.)

II.    Defendants' motion for JMOL under Rule 50(b) that Claim 1 of the '966 patent is invalid as anticipated, and alternative motion for new trial under Rule 59, dkt. 518.

III.   Defendants' motion for JMOL under Rule 50(b) that Toshiba failed to comply with the marking statute, and alternative motion for new trial under Rule 59, dkt. 516;

IV. Defendants' motion for JMOL under Rule 50(b) regarding induced infringement of both the '751 and '966 patents, and alternative motion for new trial under Rule 59, dkt. 520; and

V. Defendants' motion under Rule 60(b) for reconsideration of this court's ruling precluding defendants from pursuing an exhaustion defense, dkt. 534.

For the reasons set forth below, I am denying Nos. I (dkts. 485 522), II (dkt. 518), and V (dkt. 534), I am granting No. III (dkt. 516) and I am granting in part and denying in part No. IV (dkt. 520).

A few matters merit brief discussion at the outset: First, to the extent that the parties now are raising objections to admitted evidence to which they did not object prior to or during trial, I will not consider those arguments. Next, I will not revisit any evidentiary rulings made during the trial that have not been properly briefed in the post-verdict motions. Third, I have not considered any evidence or arguments that could have been presented to the jury at trial but were not. Finally, I note that some issues presented in the post-trial motions currently are moot in light of my ruling at trial that Toshiba could not present a damages case to the jury. Hewing to this court's philosophy of making as complete a record at the trial court level as it can fairly make, I have provided rulings and rationales so as to tee up these disputes for the parties' imminent appeal.

OPINION

**The Governing Legal Standard**

When reviewing a motion for judgment as a matter of law in patent cases under Fed. R. Civ. P. 50(b), the court applies the law of the regional circuit. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1324 (Fed. Cir. 2005). The facts are construed strictly in favor of the party that prevailed at trial while disregarding all evidence favorable to the moving party that the jury is not required to believe. *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2013). The court is not to make credibility determinations or weigh the evidence, and it must determine whether "more than 'a mere scintilla of evidence' supports the verdict." *Id.* (quoting *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)). In other words, the court's "job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *Id.*

Rule 59 allows a court to order a new trial if "the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (internal quotation marks and citation omitted); *David v. Caterpillar*, 324 F.3d 851, 863 (7th Cir. 2003). Unlike a Rule 50 motion, a court considering a motion for a new trial "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011). There is no requirement that the court view the evidence in a light most favorable to the non-moving party. *Id.* at 634.

**I.   Toshiba's JMOL Regarding Direct Infringement (dkts. 485 and 522)**

Toshiba argues that no reasonable jury could have found noninfringement of Claim 1 of the '966 patent, which requires "a data region in which data is recorded," because in the accused discs, defendants emboss pre-pits on the land (or "land pre-pits") in the data region at the time of manufacture.   Although defendants agree that the land pre-pits are embossed as grooves in the data region of the disc, they argue that the pre-pits are markers, not data.   At trial, defendants' expert, Dr. Mansuripur, explained that pursuant to the DVD specifications, land pre-pits are not formatted in the same way as other data and, therefore, cannot be the same thing as data.

Toshiba contends that in order to accept defendants' theory, the claim term "data" has to be limited (incorrectly) to *user* data.   According to Toshiba, if the court would have adopted Toshiba's proposed construction of the phrase "a data region in which data is recorded," then the jury would have no choice but to find direct infringement.   Therefore, argues Toshiba, this particular dispute actually was a legal question of claim construction.   Defendants respond that the question whether land pre-pits are data is a fact question that the jury was entitled to decide in their favor.

On the eve of trial, Toshiba advised the court that it "will likely need to address the proper construction of ['a data region in which data is recorded'] in its jury instructions."   Dkt. 447 at 4.   During trial, the parties submitted written briefs on the issue, and Toshiba proposed a jury instruction defining the claim term "a data region in which data is recorded" to mean "an area in which any data, not only user data, is recorded at some time."   Dkt. 465 at 7. Defendants had taken the position that the accused discs do not infringe the asserted claims of

the '966 patent based on the absence of "data" in the "data region."  At the jury instruction conference on the fourth day of trial, Toshiba expressed concern with defendants' position, arguing that Dr. Mansuripur had testified that the discs as manufactured do not have any data on them because data means user data as opposed to any other kind of data.  *See* Tr. Trans., dkt. 509 at 4-P-115.  The court disagreed with Toshiba's interpretation of the evidence, noting that the argument related to whether what is put in the region is data, not whether data has to be user data:

> The question, and it was raised during the evidence, is this data or is this not data.  That's allowable.  What's not allowable, and what I think Toshiba is trying to prevent here and I agree with them is you can't claim that it's not data just because a manufacturer put it there.  In other words, it doesn't have to be an end-user.

> *Id.* at 4-P-118.

Hewing to this position, I declined to adopt Toshiba's proposed construction.  Although I agreed that the term was not limited to user data, I did not see the need to define the term in order not to limit it; defining "any data" to mean "any data" did not clarify anything for the jury.  Dkt. 509 at p. 4-P-113-115.  Toshiba has failed to convince me in its post-verdict motion that this decision was erroneous or that the jury's decision was irrational.

Toshiba's expert, Dr. Hesselink, testified that data comes from either the manufacturer or the user.  *See* Tr., dkt. 504 at 2-A-37.  Dr. Hesselink testified that in the accused discs, lands or pre-pits are data in the data region and describe where you are on the disc; "that information has to be there in order to be able to write your own data [or user data] on to the disc."  *Id.* at 2-A-37 to 2-A-38.   Dr. Hesselink explained:

> [T]hese land/pre-pits essentially describe not only the address, but they also describe other information about the disc that you need to have. . . .

> So that is on the land surrounding the track in which the data is written. So essentially you have the road; you write it on the side of the road. And then there is lots of detail about how you actually write that information. Just like when the mailman goes to your house, there's a sign there that says number 25, wherever you live, and that number usually sticks out from something else that's on the wall or whatever. But it's now known that that's 25.
>
> On the disc, there's something very similar. There's something called a sync code which essentially says here is where this sector begins and then the rest of it is data that I can read. And so it's essentially a warning something is coming there and so read it. And so that sync signal is different from anything else that is on the disc and so that means that this player essentially says oh, this is a new sector and so now I'm expecting an address and I'm expecting data.
>
> So what this describes here and what this is all about is essentially how you would put that information onto the disc in the land/pre-pits according to the blueprint that is part of the DVD standard.
>
> *Id.* at 2-A-48-49.

Dr. Hesselink indicated that in his opinion, the land pre-pits *are* data.

Dr. Mansuripur testified for defendants that he disagreed with Dr. Hesselink because "data [is] defined by the standards." Section 3.2 requires a particular formatting for data, and pre-pits are not formatted in the same way. Tr., dkt. 507 at 3-A-102 to 3-A-103. "The land/pre-pit is like the markers that I showed earlier along the track. Those markers are recorded on the disc as land/pre-pits. But the data that the user puts on the disc is recorded according to this format." *Id.* at 3-A-104. Mansuripur clarified on cross examination that "according to the definition of the data from the standards, the standard manuals that I showed, land/pre-pits do not qualify as that kind of data." *Id.* at 3-A-108.

From this evidence, the jury reasonably could conclude that land pre-pits are not data. Both experts actually describe the pre-pits as having structural aspects, and it is clear from Dr. Mansuripur's testimony that land pre-pits are not formatted in the same manner as other data. The jury was entitled to accept Dr. Mansuripur's characterization of land pre-pits over the characterization offered by Dr. Hesselink.

Toshiba asserts that Dr. Mansuripur based his opinion on an impermissible narrowing of the claim term "data" because he referred to the claimed data as user data. Although Dr. Mansuripur discussed user data as a form of data that met the claim term, he did not say that data always must be user data. *See* dkt. 507 at 3-A-103-104 and 108-109. When asked on cross-examination whether he was reading the term "data" as limited to user data, Dr. Mansuripur responded that

> [i]t is usually the common understanding of the term data is the user data. But I want to be more specific in this case and I refer to the same standard that Dr. Hesselink referred to yesterday. And in that standard, the term data is defined in a certain way.

Dkt. 503 at 3-P-27. As defendants point out, the DVD standard to which Dr. Hesselink and Dr. Mansuripur referred states that "[t]he data to be stored, called the Main data, is formatted in a number of steps before being recorded on the disc" and that a "Data frame consists of . . . Main data, . . . Identification Data (ID) and others." DVD Standard PTX-0005 at § 3.2 ("Data Format"), dkt. 501, exh. 2. Land pre-pits are not discussed in this section of the standard. As a result, the jury did not need to construe the term data to mean user data in order to find for defendants.

Viewing the evidence in favor of defendants, as I must, I conclude that more than a mere scintilla of evidence supports the jury's verdict. Accordingly, I am denying Toshiba's JMOL regarding direct infringement.

## II. Defendants' Motion Regarding Anticipation of '966 Patent (dkt. 518)

Patents are presumed to be valid and an assertion of invalidity must be proved by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). An assertion that a patent is invalid because it was anticipated by prior art is a question of fact reviewed for substantial evidence when tried to a jury. *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010). To prove anticipation of a patent claim, the challenger must show that every element of the claim previously had been disclosed in a single piece of prior art. *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010). Defendants' assertion that prior art anticipated Claim 1 of the '966 patent is founded on three publications: (A) the Baker reference; (B) the 200mm Floppy Disk Standard and (C) ECMA-167.

Claim 1 recites:

1. A recording medium comprising:

> at least one recording plane, wherein each recording plane on which data is recorded includes:
>
>> a data region in which data is recorded; and
>>
>> a management region including number-of-recording-planes identifying information that represents the number of recording planes of the recording medium and recording-plane identifying information that uniquely identifies that recording plane.

At trial, Toshiba only disputed defendants' assertion that these publications anticipated the fourth element of Claim 1 related to a management region and its identifying information. Defendants contend that all three of their prior art references anticipate this fourth element. As discussed below, however, it was not unreasonable for the jury to conclude that none of these references anticipate the fourth element.

### A.  Baker reference

#### 1.  Existence of management region

Defendants argue that Toshiba failed to rebut the testimony of its expert, Dr. Immink, who explained at trial that the following description in the Baker reference represents a "very typical" management region:  "Sectors 1 and 2 of all recorded tracks accept 6, the timing tracks, are recorded with the diskette revision serial number, part number, format type, tracks per inch, bytes per sector and side identifier."   Trial Tr., dkt. 510 at 4-A-123-124 (quoting Baker reference, DTX-524 at col. 12).  The reference also includes a diagram showing where this information appears; one item in the diagram is titled "Number of Sides (1 or 2)."  According to Dr. Immink, a management region includes information regarding mechanical or physical aspects of the disc, and "for the drive, it's very important to know how many tracks there are on a floppy disk."  *Id.* at 4-A-124-125.  He also testified that in the Baker reference, the management region would appear on one side of a one-sided disc and on both sides of a double-sided disc.  *Id.* at 4-A-125.

In response, Dr. Hesselink testified for Toshiba that the Baker reference does not contain a management region because the information contained in sectors 1 and 2 repeats itself over

all of the tracks throughout the whole disc and is not contained in an area that provides unique information about the structure of the disc. *See* Trial Tr., dkt. 509 at 4-P-42-44. According to Dr. Hesselink, the '966 patent says that there has to be some area where the identifying information can be described uniquely and that is in a management region. *Id.*

Defendants now argue, as they did at trial, that Dr. Hesselink's assertion is flawed because Claim 1 is not necessarily limited to one data region in that Claim 1 recites a management region on each recording plane and the patent specification discusses the existence of "spare" management regions. But Dr. Hesselink never asserted that the Baker reference discloses multiple management regions. Instead, he opined that the Baker reference does not disclose a management region at all because the information in sectors 1 and 2 appears throughout the disk and is not arranged in the same way as in Claim 1. *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 21 (Fed. Cir. 2012) (quoting *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009)) (elements must be arranged or combined in same way as in the claim but the reference need not satisfy *ipsissimis verbis* test). Just because the '966 patent may allow for multiple management regions does not mean that the Baker reference discloses multiple management regions because it repeats information in multiple locations.

Toshiba's cross-examination of Dr. Immink also lends credence to Dr. Hesselink's opinion. Toshiba asked Dr. Immink to look at Figure 1 of the '966 patent, which relates to the actual invention, and he agreed that the management region was at the top and separated from the data region. *Id.* at 4-P-20. When asked to agree that Figure 1 "clearly doesn't show management information sprinkled throughout the data region," Dr. Immink responded "I don't know. But anyway, let's assume you're true. Okay. Yeah." *Id.*

10

### 2.  Identifying information

Claim 1 requires "number-of-recording-planes identifying information that represents the number of recording planes" and "recording-plane identifying information that uniquely identifies that recording plane."  Dr. Immink testified that the "Number of Sides (1 or 2)" field in the Baker reference is number-of-recording-planes identifying information and the "side identifier" field (identifying Side "0" and Side "1") provides recording-plane identifying information uniquely identifying each recording plane.  Trial Tr., dkt. 510 at 4-A-126-127.  On cross-examination, however, Dr. Immink admitted that at his deposition he had testified that he was unable to conclude whether the "Number of Sides" field represented the number of recording planes of the recording medium.  Trial Tr., dkt. 509 at 4-P-14-15.

Dr. Hesselink testified that the information listed in the Baker reference does not uniquely describe the physical characteristics of the disc but instead provides information about the format state.  Trial Tr., dkt. 509 at 4-P-42.  He explained that Baker reference (1) does not define what it means by the term "side identifier"; that (2) only lists "Number of Sides (1 or 2)" versus identifying the total number of sides; that (3) does not say how the "side identifier" relates to "Number of Sides (1 or 2)," if at all; and that (4) does not have an indicator that identifies what side of the disc you are on.  *Id*. at 60-61.  Further, it was not clear to Dr. Hesselink that the labels Side "0" and Side "1" are side indicators:  "What that says in my view is that on side 0 and on side 1, so if this is a two-sided diskette, then you obviously have two sides . . . you don't know what one is 0 or 1."  *Id.* at 4-P-63-64.  In other words, according to Dr. Hesselink, although this information conveys the fact that the disk has two sides, it does not indicate which side is which.

11

Given these conflicting opinions from two experts qualified to offer them, I cannot say that the jury acted irrationally by accepting Dr. Hesselink's opinion over Dr. Immink's with respect to either the existence of a management region or the presence of identifying information. Construing the facts strictly in favor of Toshiba and disregarding Dr. Immink's opinion, which the jury was not required to accept, shows that it was reasonable for the jury to conclude from Dr. Hesselink's testimony and the contents of the Baker reference that the Baker reference either does not disclose a management region at all and/or does not disclose the requisite identifying information.

## B. 200 mm Floppy Disk Standard

Dr. Immink testified that the 200mm Floppy Disk Standard has a management region because it discloses an Index Cylinder that has descriptive information about the volume (or the disk) and the data recorded on it. Trial Tr., dkt. 510 at 4-A-135-137. According to Dr. Immink, the volume label describes all kinds of management information, including a surface indicator that states how many sides are formatted. *Id.* at 4-A-137-138. If the surface indicator is "space" or "1," then the disc is single-sided and formatted on only one side; if it is "2," then both sides of the disc are formatted. *Id.* Therefore, under defendants' theory, the surface indicator contains information representing the number of recording planes.

When cross-examined, however, Dr. Immink admitted that he had testified in his deposition that he did not know, even after hundreds of hours of analysis, whether the surface indicator information in the 200mm standard represented the number of recording planes. Trial Tr., dkt. 509 at 4-P-11-12.

12

Defendants now, post-trial, have flagged what they deem to be several, irrefutable errors with Dr. Hesselink's testimony at trial.  However, as Toshiba points out, *at* trial, defendants presented their entire invalidity case through Dr. Immink.  Although the jury also had a copy of the reference itself, I don't share defendants' assessment that any of the prior art in this case made "unmistakable disclosures."  This was not a case in which the technology was so easily understood that the jury would have been able to consider the questions of infringement and invalidity without expert testimony. *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369-70 (Fed. Cir. 2004) (typically, expert testimony is necessary in cases involving complex technology or where matters are beyond the comprehension of laypersons).  Therefore, regardless of any errors that Dr. Hesselink may have committed, a reasonable jury could conclude solely from Dr. Immink's self-impeaching testimony that defendants failed to prove that the 200mm standard anticipated the Claim 1 of the '966 patent.

Considering those arguments on this point that defendants properly raised at trial, defendants have not shown that the jury was not entitled to rely on Dr. Hesselink's testimony. Contrary to defendants' assertion, Dr. Hesselink did not concede that the 200mm standard disclosed a management region.  He agreed in principal that a management region has to contain information about the number of sides on the disc and the side of the disc that is on.  However, Dr. Hesselink testified that the Index Cylinder in the 200mm standard does not contain information about the physical structure of the disc, but instead has information related to formatting.  Trial Tr., dkt. 509 at 4-P-39-42.  Unlike Dr. Immink, Dr. Hesselink distinguished formatted surfaces from recording planes, indicating that a floppy disc can be formatted in a number of ways that do not necessarily represent or equal the number of recording planes.  As

13

a result of this, Dr. Hesselink concluded that the 200mm standard does not contain the requisite

information about the number of sides on the disc.  *Id.* at 4-P-41.

Second, defendants contend that Dr. Hesselink improperly implied that to meet Claim

1, the *purpose* of the surface indicator must be to identify the precise number of recording planes

on the recording medium.  I disagree.  In the testimony cited by defendants, Dr. Hesselink

testified:

> So if you look at that Section 7.3.7, it says surface indicator and
> CP 72. That means it's a character position 72. This says "this field
> shall specify the number of..." and this is very important, it says
> formatted surface. It doesn't say the number of surfaces of the
> volume, it says the number of formatted surfaces of the volume.

> Trial Tr., dkt. 509 at 4-P-40: 6-12.

On cross-examination, defense counsel attempted to get Dr. Hesselink to agree that the purpose

of the surface indicator was irrelevant to the anticipation analysis.  *Id.* at 4-P-69-70.   Dr.

Hesselink wouldn't go there, responding "But I don't think I discussed a purpose.  I discussed

what the values were that this indicator could take."   Dr. Hesselink's testimony on direct

examination was that a surface indicator specifying the number of formatted surfaces is distinct

from information representing the number of recording planes, and the jury was entitled to rely

on this opinion instead of the opinion rendered by Dr. Immink.


### C.  ECMA-167

ECMA-167 discloses a Primary Volume Descriptor that identifies "a volume and certain

attributes of that volume," including the "Volume Sequence Number" and the "Maximum

Volume Sequence Number."  The parties agree that the reference defines a "volume" as a "sector

address space as specified in the relevant standard for recording." Dkts. 519 at 28 and 524 at 19. The parties' dispute regarding the ECMA-167 reference centers on whether these volume indicators represent the number of recording planes or uniquely identify a given recording plane.

Defendants, in the brief supporting their motion, argue that Hesselink was incorrect when he testified that "nowhere in that standard does it describe that there can only be one volume on one side or that you can change it." Trial Tr., dkt. 509 at 4-P-45. They assert that the following disclosure from ECMA-167 refutes this testimony and shows that the Volume Sequence Number uniquely identifies the recording planes and the Maximum Volume Sequence Number represents the number of recording planes:

> 5.12 Volume
>
> A sector address space as specified in the relevant standard for recording.
>
> NOTE 2
>
> A medium usually has a single set of sector addresses, and is therefore a single volume. A medium may have a separate set of addresses for each side of the medium, and is therefore two volumes.
>
> *See* dkt. 519 at 30.

Dr. Hesselink disagreed, explaining that:

> Dr. Immink brought up the example of having four discs that would be a volume set. And so if you have one side to the disc and you know that you have four volumes, then you would have four sides. Well, the problem with that is that this is not uniquely the case. And so nowhere in that standard does it describe that there can only be one volume on one side or that you can change it. In fact, if you have, for example, a DVD9, which is a DVD in which the movie typically goes to the end of the disc and so when you're at the end of the disc the counting goes from the outside to the inside whereas on the one side it goes from inside to outside. So

15

it's essentially one track. In that case, there is unique identifiers and a unique sector header for both sides. And so that's one volume. That's not two volumes.

\* \* \*

The real problem comes in is that under the ECMA-9660, it is possible to have multiple volumes on the same side.

\* \* \*

Because of the difficulties that I just described to you, there isn't a unique relationship between volume and volume -- maximum number of volumes in that volume set that describe either the number of sides that you're on or decide that the information is recorded on.

Trial Tr., dkt. 509 at 4-P-45-47.

Defendants argue that regardless what Dr. Hesselink believes, it is clear from its face that ECMA-167 discloses at least one embodiment in which a single-sided disc constitutes a single volume. However, a reasonable jury could conclude from Dr. Hesselink's testimony that "volumes" and "recording planes" are not the same things, even if their numbers may sometimes overlap.

In conclusion, the jury had ample evidence to support its conclusion that the prior art did not anticipate Claim 1. Accordingly, I am denying defendants' motion for judgment as a matter of law on this point.

In the alternative, defendants contend that the jury's verdict was against the manifest weight of the evidence. However, defendants have failed to show any errors that undermined the fairness of the trial or led to an incorrect verdict. Instead, they rely solely of the arguments that they made in support of their motion for JMOL. As a result, the court need not consider these arguments again. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007).

16

**III.    Defendants' Motion for JMOL or New Trial on Toshiba's Compliance with the Marking Statute (dkt. 516**)

The patent marking statute, 35 U.S.C. § 287(a), limits the damages Toshiba may recover to periods after it has provided constructive or actual notice of infringement:

> Patentees, and persons making, offering for sale, or selling . . . any patented articles for or under them or importing any patented articles . . . may give notice to the public by [marking the patented product.] . . . In the event of failure so to mark, no damages shall be recovered by patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.

Under this statute, therefore, a patentee may notify a party it believes is infringing its patent by providing either constructive notice through appropriate marking on the product or label, or actual notice to the alleged infringer.  *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997).  "The marking statute serves three related purposes:  1) helping to avoid innocent infringement; 2) encouraging patentees to give notice to the public that the article is patented; and 3) aiding the public to identify whether an article is patented."  *Nike, Inc. v. Wal–Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 2010) (citations omitted).[1]

At trial, Toshiba had the burden of proving that it complied with either the marking requirement or the specific notice requirement of § 287.  *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894) ("The duty of alleging, and the burden of proving, either [actual notice or constructive notice] is upon the [patentee].").  See also 7 Donald S. Chisum, Chisum on Patents § 20.03[7][c][v] (2002) ("A plaintiff who seeks to recover for damages for acts prior to the filing

---

[1] The issue of pre-suit notice ordinarily is a damages question.  Although the court struck Toshiba's damages case, in the interests of efficiency it submitted the notice question to the jury during the liability phase.

of suit bears the burden of pleading and proving compliance with either the marking requirement

or with the specific notice requirement.").

There is no dispute that Toshiba did not mark its products.  The question is whether

there was sufficient admissible evidence from which a jury could find that Toshiba provided

defendants with actual notice of their infringement of the '751 and '966 patents.[2]

Actual notice under § 287(a) "requires the affirmative communication of a specific charge

of infringement by a specific accused product or device."  *Amsted Industries Inc. v. Buckeye Steel

Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994) (vacating damages award where "merely

informational" notice was not actual notice within meaning of Section 287(a)).  *See also Gart v.

Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001) (noting that mere "notice of the patent's

existence or ownership" is insufficient to constitute actual notice).  To comply with the statute,

the patentee must inform the recipient of the identity of the patent and the activity that is

believed to be an infringement, and the notice must be accompanied by a proposal to abate the

infringement, whether by license or otherwise.  *SRI Int'l*, 127 F.3d at 1470.  "Although there are

numerous possible variations in form and content, the purpose of the actual notice requirement

is met when the recipient is notified, with sufficient specificity, that the patent holder believes

that the recipient of the notice may be an infringer."  *Id.*

---

[2] In a footnote in its response brief, Toshiba suggests for the first time in this litigation that it
was not obliged to provide actual notice before recovering damages because it never sold the patented
articles in the United States.  Dkt. 525, n.1 ("In arguing that the jury's notice finding should not be
disturbed, Toshiba is not waiving its argument that it was not obligated to provide notice").  This
argument appears to have been waived by Toshiba's failure to assert it during trial, notwithstanding
the fact that notice is ordinarily addressed during the damages phase.  In any case, because Toshiba
does not develop this argument beyond a mere footnote, I do not address it further here.  *See U.S. v.
Dickerson*, 705 F.3d 683, 691 (7th Cir. 2013) (recognizing that an undeveloped argument is waived).

Notice under § 287(a) is to be distinguished from knowledge on the part of the alleged infringer. Notice must be accomplished by an affirmative act on the part of the patentee. *Amsted*, 24 F.3d at 187 (citing *Dunlap*, 152 U.S. at 247-48). Absent such an affirmative act,

> it is irrelevant . . . whether the defendant knew of the patent or knew of his own infringement. The correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or understanding of the infringer.

*Id*. *See also Gart*, 254 F.3d at 1346 ("Determining whether the patentee's communication provides 'sufficient specificity' regarding its belief that the recipient may be an infringer cannot take into consideration the knowledge or understanding of the alleged infringer, but must focus on the action of the patentee."); *Nike*, 138 F.3d at 1446 (focus for purpose of marking statute "is not on what the infringer actually knew, but on whether the patentee's actions were sufficient, in the circumstances, to provide notice *in rem*"); *American Medical Systems, Inc.*, 6 F.3d 1523, 1537 n. 18 (Fed. Cir. 1993) (notice of infringement must come from the patentee, not the infringer); *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1066 (Fed. Cir. 1987)("Absent notice, [defendant's] 'knowledge of the patents' is irrelevant.").

Consistent with these authorities, this court instructed the jury in this case as follows:

> Actual notice means that Toshiba communicated to the defendant a specific charge of infringement of the patent by a specific accused product or device. For each defendant, Toshiba has the burden of establishing that it is more probable than not that the defendant received notice of infringement before the filing of this lawsuit.

Toshiba's primary evidence of notice consisted of letters mailed by the DVD6C Licensing Agency (DVD6C) to defendants in 2003. DVD6C is the authorized licensing agent for its members, which includes Toshiba and six other leading developers of industry-wide standards for DVD technology. Collectively, the seven members of DVD6C own hundreds of patents that

they have deemed are essential for a product to comply with the industry standard (known as the DVD specifications).

In 2003, DVD6C mailed letters to each of the defendants, offering each of them a portfolio license that would cover the hundreds of patents that DVD6C had deemed were essential to practicing the DVD industry standards. The DVD6C letter to Imation, which is not materially different from that sent to the other defendants, reads in relevant part:

> We write on behalf of the DVD6C Licensing Group (DVD6C) to offer your company a portfolio license that covers essential patents for certain DVD formats . . . The portfolio license includes DVD6C Members' essential patents for the DVD-ROM, DVD-Video, DVD-Audio, DVD-RAM, DVD-RW and DVD-R formats.
>
> All companies who practice these patents, including in the manufacture of players, recorders, drives, decoders and discs, must be licensed. DVD6C's joint licensing program offers an efficient means to be licensed, and, therefore, to avoid patent infringement, by offering a package of essential patents owned by the seven members. Please see enclosed license agreement and patent lists . . .
>
> Potential licensees are also free to negotiate separate license agreements with each of DVD6C's seven member companies.
>
> Swoopes Decl., dkt. 527, Ex. Z, PTX-0194, at 1.

This letter went on to outline the basic terms of the license agreement, and included a draft "DVD Patent License Agreement."

Enclosed with the letter to Imation was a list of 1800 patents, listed by number and patentee, that DVD6C deemed "essential" to the standards, *id*. at 23-57. The letters to Ritek, CMC and Moser Baer did not include this list; those letters merely provided a link to DVD6C's website where this same list of essential patents could be found. *See id*., Exhs. AC, AG, AI. This list of 1800 essential patents was broken into subcategories for the various products, identifying

separately the patents that were necessary for read-only hardware, recordable hardware, read-only media, recordable media and recordable disc cases. "Recordable media" were identified to include DVD-RAM, DVD-RW and DVD-R discs. There were 360 patents or groups of patents listed as being essential to these products.

The jury found that Toshiba had met its burden with respect to defendants Imation Corp., Moser Baer India Ltd., Ritek Corp. and CMC Magnetics Corp.[3] Defendants argue that the jury lacked a legally sufficient basis for reaching this conclusion because: (1) the only notification of infringement came from the DVD6C Licensing Agency, not Toshiba; (2) the DVD6C letters lacked the requisite specificity, in that they did not identify which specific patents applied to which specific recordable DVD products; and (3) with respect to the '751 patent, the DVD6C letters could not have constituted a charge of infringement with respect to DVD-R or DVD-RW formatted discs because DVD6C did not consider the '751 to be an essential patent for these formats. Defendants are correct, as discussed below:

## A. Defendants' Own Actions and State of Mind are Not Relevant

Before addressing the sufficiency of the communications from DVD6C, I briefly address a number of other pieces of evidence to which Toshiba points as supporting the jury's finding of notice. Toshiba relies on evidence that: (1) certain defendants were members of the DVD

---

[3] These were the only four defendants for whom notice was at issue because the court had ruled before trial that there was no evidence that the remaining defendants had been notified. Ord. on Motions in Limine, March 26, 2013, dkt. #417, at 44-45. With respect to the remaining defendants, the court deferred ruling on the question whether the pre-suit communications between DVD6C and these defendants were sufficient to comply with the requirements of the marking statute, observing that evidence of such communications was relevant to the question of knowledge and therefore would be presented to the jury in any event, and noting the court's preference for an overly-inclusive trial. *Id.* at 42-43.

forum that developed the DVD specifications; (2) certain defendants already were licensees of the patents-in-suit for pre-recorded disc technology; (3) Moser Baer made statements indicating that it needed a license, but later decided not to license; (4) Moser Baer ignored the list of patents in DVD6C's offer; and (5) Imation forwarded DVD6C's offer of a portfolio license to its suppliers.

None of this evidence, which concerns the actual knowledge and actions of defendants, is relevant to the question of notice. As set out above, the relevant inquiry for purposes of the notice statute is on the actions of the patentee, "not the knowledge or understanding of the infringer." *Amsted*, 24 F.3d at 187. As the court explained in *Amsted*, because one of the purposes of the notice statute is to provide an incentive for patent holders to mark their products or provide actual notice, it is irrelevant that a defendant may have known of the patent or even may have known of its own infringement. *Id*. Accordingly, this court's examination of the evidence must focus on what Toshiba did to notify defendants that they were infringing the patents-in-suit, not on the subjective state of mind of defendants. Because all of the evidence itemized above falls into this latter category, it is irrelevant to determining actual notice.

### B. Communications from Toshiba's Agent, DVD6C, Do Not Suffice for Notice under § 287(a)

It is undisputed that Toshiba never contacted any of the defendants to notify them of their infringement of either the '751 or '966 patents. Instead, Toshiba relies on letters sent to defendants by the DVD6C Licensing Agency in 2003. Defendants contend that correspondence

from DVD6C, instead of Toshiba itself, is insufficient as a matter of law to comply with § 287(a).[4]

In support, defendants cite *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1327 (Fed. Cir. 2001). In *Lans*, the inventor (Lans) sent a notice of infringement in 1996 to defendants, wherein he identified himself as the "inventor and owner" of the patent in question. *Id*. at 1325. However, Lans had previously assigned the patent to Uniboard, a company that he solely owned and managed. Uniboard later sued the defendants for patent infringement, claiming that the notification letters sent by Lans in 1996 were sufficient to comply with § 287(a) and therefore Uniboard could recover pre-suit damages.

The Federal Circuit disagreed. It explained that, besides alerting the alleged infringer to avoid further infringement, the notice requirement also "permitted the alleged infringer to contact the patentee about an amicable and early resolution of the potential dispute," either by design changes, negotiations for licenses or early resolution of rights in a declaratory judgment proceeding. *Id*. Notice from someone closely associated with the patentee, said the court, did not further these goals because "only the patentee has authority to grant licenses or accept design changes to facilitate the purposes of the notification requirement." *Id*. Further, reasoned

---

[4] Toshiba makes the puzzling argument that defendants waived their right to challenge notice on this ground by failing to object to the jury instruction and verdict form. As defendants point out, however, there was no reason for them to object to the jury instruction because the instruction accurately stated their position that notice had to come from Toshiba. Defendants were not required to request a negative instruction, which the court likely would have rejected as redundant, and which might have had the unintended effect of shifting the burden to defendants to show that they had not received notice.

Toshiba also claims that defendants waived their argument that DVD6C ≠ Toshiba because they failed to raise it in their Rule 50(a) motion. But defendants *did* make this argument. *See* Trial Tr. 5-A-29; 5-30:10 (moving for judgment as a matter of law on various grounds, including that DVD6C did not have all substantial rights to the patents-in-suit and therefore was not party that could provide notice).

the court, permitting notice to come from someone other than the patentee would pose difficult, if not unworkable, enforcement problems for the courts, who would be faced with making "troublesome determinations about the sufficiency of relationships between the notifier and the patentee." *Id*. As somewhat of an afterthought, the court remarked that agency principles would not help to solve this problem, "because the notifying party would not likely even purport to act on behalf of the patentee." *Id*.

If *Lans* was the Federal Circuit's final word on the subject, then defendants would win the instant dispute handily: *Lans* appears to impose a rule that notice must come from the patentee, period. But in *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371 (Fed. Cir. 2007), the Federal Circuit found that a notification letter sent by an affiliate of the patent assignee was sufficient to comply with § 287(a) where the author identified himself as the "patent Portfolio Manager" speaking on behalf of the "Corporate Intellectual Property" division of the affiliate, and where the patent's first page, which was enclosed with the letter, correctly identified the assignee. The court first noted that, unlike *Lans*, the infringer had notice of the patentee's identity by virtue of the front page of the patent, which had been enclosed with the notification letter. *Id*. at 1375. Second, the court observed that although the notification letter did not purport to come from the patentee, "it is undisputed that Philips International B.V. [the affiliate] had the ultimate responsibility for licensing and enforcement of the '181 patent." *Id*. Thus, said the court, the reasons it had articulated in *Lans* for strictly enforcing the notice requirement all had been fulfilled: Philips International B.V.– the sender of the letter–was the party to contact about an amicable and early resolution of the potential dispute, to consult with about design changes to avoid infringement, and with whom to negotiate a valid license. *Id*.

Defendants argue that even under *U.S. Philips*'s more expansive reading of § 287(a), the letters from DVD6C were deficient. I agree. Unlike the affiliate in *U.S. Philips*, DVD6C did *not* have ultimate responsibility for licensing and enforcement of the patents-in-suit. As defendants point out, Mr. Ozaki, the general manager of the DVD6C licensing program, testified that he was authorized to license all 1,800 of the DVD6C essential patents only "as a totality" and was not authorized to license individual patents on behalf of any of the individual members of the pool. Trial Tr. at 3-A-25, 3-A-26, 3-A-28. DVD6C, in other words, was authorized to license the entire *package* of patents on behalf of the *entire* DVD6C pool.

With respect to licensing particular patents owned by each individual pool member, however, Osaki testified that he was not authorized to do this. Indeed, Osaki stated that "he was not in a position to know the status of individual [DVD6C member] licensing," and that there was a "strong firewall" erected between DVD6C and the individual members. Trial Tr. at 3-A-28. Thus, if any of the defendants were to have contacted Osaki and asked him how they could design around the '966 or '751 patents, or what the price would be to obtain an individual license for these patents, Osaki could not have answered these questions. DVD6C also was not authorized to sue the defendants for infringing the '751 or '966 patents.

I am satisfied that under these circumstances, DVD6C was not the party with *ultimate* responsibility for licensing *and* enforcement of the patents in suit. That party was Toshiba. Accordingly, under the guidelines articulated in *U.S. Philips,* the communications from DVD6C cannot be deemed to have come from Toshiba for purposes of § 287(a).

25

### C.  The DVD6C Letters Fail to Satisfy § 287(a)

Even if the communications from DVD6C could be deemed to have come from Toshiba, I further agree with defendants that the letters lacked the specificity required by the notice statute.  To be sure, the letters are more specific than the industry-wide mailing sent out by the patentee that was deemed deficient in *Amsted*, which stated merely that the defendant should "acquaint [it]self with the ['269 patent] and refrain from supplying or offering to supply component parts which would infringe or contribute to the infringement of the patent," and that Amsted "expect[ed] to continue to enforce [its patent] rights which it ha[d] acquired."  *Id*. at 186.  DVD6C's letters did more than simply inform the industry of the pool's ownership of the numerous patents and exhort companies not to infringe.  The letters: (1) affirmatively communicated to recipients that a license was required in order to manufacture and sell products held out as being compliant with the industry standards for various DVD formats, and (2) identified the patents deemed essential to the practice of industry standards with respect to particular categories of products.

Although defendants assert that it is unreasonable expect them to have checked their DVD-related products for infringement of over 1800 patents, I agree with Toshiba that defendants were sophisticated enough to have known that they only needed to concern themselves with the patents identified as essential to recordable media.  There were "only" about 360 such patents.  Even if 360 patents were deemed to be a manageable number to review–a debatable proposition–it still is too great a stretch to say that the DVD6C letters made a *specific* charge of infringement by a *specific* accused product or device.  For one thing, the letters did not identify any *particular* recordable media product or device manufactured or sold by any of the

defendants that allegedly infringed specific patents. Instead, the letters were premised on the assumption that any recordable disc that was manufactured or sold as compliant with the DVD specifications for the various formats necessarily infringed one or more patents in the licensing pool. This assumption was not valid: as the Federal Circuit found in this case, "even the DVD standards recognize that users may record to DVDs without finalization," *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012), and Toshiba conceded that unfinalized DVDs do not infringe. *Id.* Thus, with respect to the '751 patent (and possibly others), it was possible for a recordable disc to comply with the DVD specifications and not infringe any of the listed patents.

Further, DVD6C did not deem all 360 patents to be essential to all three of the recordable disc formats. The '751 patent, for example, was deemed to be essential only to the DVD-RAM format. Rather, the list of patents identified by DVD6C as being "essential" included any patent that was essential for "at least one" of the recordable formats. *See* Trial Tr. at 2-P-99 (Ozaki testimony). Yet, instead of specifying which of the 360 or so patents identified as being essential to recordable media applied to which of the three formats identified, the DVD6C letters combined the three recordable disc formats into a single category. Thus, for a defendant to have determined whether it might be infringing a listed patent, it would have faced the Augean task of examining its discs in each of the three formats and then comparing them to each of the hundreds of patents identified as essential to determine whether a certain type of disc infringed a certain patent on DVD6C's list.

This cannot be what the notice statute intended. How could the recipient of a letter as scattershot as that sent by DVD6C meaningfully attempt to resolve disputes early or to design

around any possible infringement without knowing which of their products are accused of infringing which patents? DVD6C's letter technically might have constituted an affirmative act, but under the circumstances, it was not enough. Given the large number of patents involved, DVD6C *at least* should have identified which patents were relevant to which disc format. Toshiba's broader position unfairly shifts the burden to defendants to attempt to identify accurately any potentially infringing conduct so as *not* to be faced with an award of pre-suit damages in the event it was sued for infringement.

The Hon. Barbara B. Crabb reached a similar conclusion in *Fujitsu Ltd. v. Netgear, Inc.*, 2009 WL 3047616 (W.D. Wis. Sept. 18, 2009), *rev'd in part on other grounds*, 620 F.3d 132196 (Fed. Cir. 2010). In *Netgear*, a representative of a licensing pool sent a letter to the defendant, explaining that, on behalf of the pool members, he was offering defendant a license to patents that were "essential to the practice of the IEEE 802.11 Standard," an industry standard for wireless technology. *Id*. at *7. The representative attached a sample patent license agreement, which listed the '952 patent as one of five patents, but he did not attach a copy of the '952 patent, did not refer to specific claims of the '952 patent, and did not refer to any specific products sold by defendant. In a follow-up communication, the representative listed two patents among a total of 42 patents, but again did not attach copies of any patents or refer to specific patent claims or products sold by defendants.

Judge Crabb found these letters insufficient to satisfy § 287(a)'s notice requirements. Although the letters offered a license and identified a group of patents, they "failed to identify any specific products that allegedly infringed specific patents," but instead were premised on the invalid assumption that any product sold as compliant with the industry standard infringed one

or more of the patents in the licensing pool.  *Id*. at 9.  Judge Crabb noted that the extensive 802.11 standard had many sections that permitted wireless devices to function in several ways and still comply with the standard, and not every patent in the license pool covered every section of the standard, but the plaintiffs' licensing agent nonetheless "refused to tell defendant which sections or functions were at issue."  *Id*.  For this reason alone, Judge Crabb found, the letters were insufficient to meet § 287(a)'s notice requirement.  *Id*.  As she explained:

> It cannot be considered adequate notice for a group of patent holders pooling their patents to simply state without proof that products practicing an industry standard necessarily practice some of the pooled patents and inform parties that advertise products practicing the standard that they can obtain a license over all patents in the pool while never identifying which specific products may infringe any specific patent. Approving plaintiffs' strategy would permit licensing pools to bully potential infringers into licensing agreements. It would place an unreasonable burden on the potentially infringing party, who would be required to examine all of its products to try to determine whether any infringed any claim of the pooled patents. In this case, that would mean defendant was responsible for examining hundreds of products and several dozen patents, each with several independent claims. Faced with such a large task and given a short time in which to respond to the license offer, the potentially infringing party is placed in an untenable position: (1) turn down the license and face a potential infringement action involving an unknown number of patents and an unknown number of products or (2) pay for a license even though the license (a) may be completely unnecessary; (b) may not cover many of the alleged infringer's products; or (c) may cover many patents that its products do not practice.

> *Id*.

Toshiba argues that *Netgear* is not on point because it involved hundreds of potentially infringing products and a short time frame for responding to the offer to license, whereas this case involved only 3 types of infringing products (DVD-R, DVD-RW and DVD-RAM recordable discs) and negotiations between defendants and DVD6C that lasted for years.  This argument

29

is unpersuasive.  Although it is true that this case involves far fewer products, it involves many more patents (360 compared to 42).  Thus, just as in *Netgear*, the burden on defendants is substantial.  This burden is not significantly lessened merely because DVD6C gave no indication that time was of the essence.  (Although time pressure was mentioned in *Netgear*, Judge Crabb appears to have been speaking hypothetically since there is no indication from the facts that the defendants were under time pressure to take a license).  Nothing in § 287(a) suggests that defective notice can be "cured" by allowing the defendant lots of time to conduct the analysis that the patent holder should have conducted in the first place.

### D.    The DVD6C Communications Could Not Have Conveyed a Specific Charge of Infringement of the '751 Patent as to Products Except DVD-RAM

Finally, I agree with defendants that even if the DVD6C letters otherwise were adequate to satisfy the notice statute, nevertheless they only conveyed a specific charge of infringement with respect to DVD-RAM products.  The letters informed defendants that they would need to take a license to those patents that DVD6C had deemed "essential" to make, use or sell DVD products.  The draft patent license enclosed with the letter defined "essential" as "necessarily infringed when implementing the DVD Standard Specifications or claiming technologies for which there is no realistic alternative in implementing the DVD Standard Specifications."

At trial, Toshiba's witnesses testified that the '751 patent had not been considered or marketed as essential for any of the accused products except for DVD-RAM.  Trial Tr. 2-A-48:23-49;23, 2-P-99:16-25.  Thus, even had defendants undertaken the burden of attempting to discern which patents their products might actually be infringing, they would have learned

from DVD6C that the '751 was not an "essential" patent for DVD-R and DVD-RW discs. Accordingly, the letters did not communicate a "specific charge of infringement" of the '751 patent against these products.[5]


### E.  Conclusion

In sum, I find that the communications from the DVD6C Licensing Agency to the defendants fail to provide a legally sufficient evidentiary basis from which the jury could find that Toshiba communicated to defendants a specific charge of infringement of the patents by a specific accused product or device.[6]  Accordingly, defendants' motion for judgment as a matter of law on Toshiba's claim of entitlement to pre-suit damages is GRANTED.  At this juncture in this case this ruling is academic, but prudence suggests that the court rule on every post-trial motion in order to make a thorough record for appeal.

---

[5]  Toshiba correctly points out that defendants made this argument before trial and I did not find it persuasive at the time.  Having heard the evidence adduced at trial and having reconsidered the issue, now I am persuaded that defendants are correct.

[6]  Toshiba also relies on DVD6C communications with defendants regarding its DVD Patent Licensing Program that occurred after 2003.  Although it is true that a court may consider later communications in conjunction with earlier communications in deciding whether § 287(a) has been satisfied, *see, e.g., Gart*, 254 F.3d at 1347, none of the later communications provided any additional information that reasonably would have notified defendants which patents their products were allegedly infringing.  Like the 2003 letters, DVD6C's later communications with defendants simply stated that defendants needed a license in order to sell recordable DVDs, and encouraged them to enter into a portfolio license with DVD6C.  Moreover, the later communications were not communications from Toshiba.  Accordingly, these communications do not afford an adequate evidentiary basis from which the jury could have found notice.

IV.    **Defendants' Motion for JMOL, or in the alternative, Motion for New Trial Regarding Induced Infringement of the '751 and '966 Patents (dkt. 520)**

At trial, Toshiba's theory of infringement with respect to the '751 patent was that defendants encouraged users to finalize DVDs, either knowing that, or willfully blind to the fact that, if users did so, then the users would infringe the '751 patent.   With respect to the '966 patent, Toshiba's theory was that defendants encouraged end users to record data on DVDs, either knowing that, or willfully blind to the fact that, if users did so, then the users would infringe the '966 patent.

Infringement is a question of fact that is reviewed for substantial evidence when tried to a jury.  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008).  Under 35 U.S.C. § 271(b), a party is liable for infringement if it "actively induces infringement of a patent."  "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks omitted).   Thus, to support a finding of inducement there must be "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).   A party has the requisite knowledge if it knew "that the induced acts constitute patent infringement," or was willfully blind to the infringement.   A party is willfully blind if it believed there was a high probability that the acts constituted patent infringement and took deliberate steps to avoid learning of the infringement.   *Global–Tech Appliances, Inc. v. SEB S.A.*, ___ U.S. ___, 131 S.Ct. 2060, 2068, 2070 (2011).

A patentee may prove both indirect infringement and the corresponding direct infringement by circumstantial evidence. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se." *Id*. Moreover, "[t]he drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder that observed the witnesses." *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact"). At the same time, however, "the court must make its own assessment of the sufficiency of the non-movant's evidence." *Silicon Graphics, Inc. v. ATI Techs., Inc.,* 569 F. Supp. 2d 819, 822 (W.D. Wis. 2008) citing *Erickson v. Wisconsin Dept. of Corrections*, 469 F.3d 600, 602 (7th Cir. 2006)). The evidence must provide a sufficient basis from which the jury reasonably could have reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts. *Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir. 1984).

Imation Corp., Moser Baer India Ltd., Ritek Corp. and CMC Magnetics Corp. contend that the evidence adduced at trial was insufficient to sustain the jury's verdict. Defendants concede that Toshiba met its burden with respect to establishing acts of direct infringement, but maintain that it failed to show that: 1) any of the defendants encouraged finalization after they

knew finalization would cause infringement of the '751 patent; and 2) defendants had the specific intent to cause infringement of either the '751 or '966 patents.[7]

## A.  The '751 Patent–Active Inducement

Defendants assert that there is no evidence showing that Moser Baer or CMC made any communications whatsoever to end users that encouraged them to finalize a DVD.[8]  As for defendants Ritek and Imation, defendants acknowledge that there was some evidence introduced that they instructed users to finalize, but assert that there was no evidence showing that these statements were made after the defendants learned that finalization would cause infringement.

Toshiba responds by pointing to various pieces of evidence that might establish a claim of *contributory* infringement, but this evidence does not suffice to prove that defendants took active steps to *induce* end users to finalize discs.  For example, Toshiba points out that defendants built their discs according to the DVD standards, they included a reference code zone, and they promoted the discs as being standards-compliant.  However, the DVD standards permit both finalized and unfinalized discs; telling consumers that defendants' discs comply with the standard is not an instruction to finalize the disc.  *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327-28 (Fed. Cir. 2010) (where relevant section of industry standard is optional, not sufficient for patent owner to establish infringement by arguing that product admittedly practices the

---

[7]  Defendants do not dispute that the evidence adduced at trial was sufficient to establish direct infringement of the '966 by end users and that defendants encouraged this use by selling recordable DVDs.

[8]  Defendants also note that Toshiba failed to present any evidence showing that any end user finalized a DVD as a result of any statement made by any defendant.  I rejected this "causal nexus" argument in previous orders, *see* Ord. on Mots. in Limine, dkt. 417, at 52-53 and Supp. Ord. on Mots. in Limine, dkt. 455, at 10-14, and I see no reason to change that ruling now.

standard, therefore it infringes). Where a device is capable of being used in an infringing and a non-infringing manner, the mere sale of the device is not inducement. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318–19 (Fed. Cir. 2009)(upholding jury verdict of induced infringement where accused inducer designed accused products to be used in infringing manner *and* instructed its customers to use accused products in infringing manner); *ACCO Brands, Inc.*, 501 F.3d at 1313-14 (citation omitted). Rather, the defendant must have taken some active steps to aid, abet or encourage the end user to use the product in an infringing way. *DSU Med. Corp.*, 471 F.3d at 1306.

### 1. Moser Baer and CMC

Against this backdrop, I agree with defendants that the evidence adduced at trial, even when viewed in the light most favorable to Toshiba, is insufficient to show that defendants Moser Baer or CMC encouraged finalization. Toshiba identifies no exhibits or testimony showing that Moser Baer took any active steps to encourage finalization. With respect to CMC, Toshiba identifies two documents that were produced from CMC's files that referred to the need to finalize a disc: 1) packaging materials from a Sony Handycam camcorder; and 2) an internal Chinese document dated in 2005 that pertained to mini DVD-R packaging. I agree with defendants that neither of these documents reasonably supports a finding that CMC encouraged end users of its recordable discs to finalize. CMC's corporate representative, Robert Tsai, provided unrefuted testimony that CMC does not make, sell or otherwise distribute Sony Handycams. His guess was that someone at CMC had purchased the Handycam and that's why these materials were in CMC's files; in any event, there is no evidence that CMC authored the

document or distributed it to its potential customers.  I agree with CMC that its mere possession of a third party manual, without more, does not establish that CMC took action to encourage DVD users to finalize their discs.

As for the 2005 Chinese document, Toshiba did not introduce any evidence that this document ever was made available to DVD purchasers in the United States.  Documents never seen or read by product users cannot encourage them to infringe.  It was undisputed at trial that none of the packaging DVDs that CMC sold in the United States referenced finalization.  To the extent that the jury might have inferred from these internal documents that "there must have been" corresponding public documents doing the same, the jury would have been engaging in unwarranted and unreasonable speculation.  Accordingly, the jury's verdict in which it found that CMC induced infringement of the '751 patent cannot stand.

### 2.   Imation

With respect to Imation (which owns the Memorex brand), Toshiba introduced two undated user guides related to a Memorex DVD recorder and excerpts of the Memorex web page regarding mini-DVDs.  *Id*. at Exhs. K, L, S, T.  Although Imation concedes that these statements could be seen as encouraging end users to finalize discs, it argues that the evidence adduced at trial was insufficient to show that Imation made these statements *after* it knew that finalization caused infringement.  As defendants point out, Toshiba introduced these documents through Dr. Hesselink.  Defendants argue that Dr. Hesselink's testimony is insufficient to meet Toshiba's burden because Dr. Hesselink offered no testimony regarding when (or if) Imation provided the DVD recorder user guides to its customers and he could not recall whether he had visited the

Memorex website or merely looked at a paper copy of it.  Absent specific dates as to when

Imation made these statements publicly, defendants argue, there was no way for the jury to

conclude—except by speculating—that Imation encouraged finalization *after* Imation became

aware that finalization caused infringement.

> Toshiba's response to this argument is that
>
>> Defendants try to dismiss the Imation evidence by claiming that
>> the Memorex recorder was discontinued and that the webpages
>> were not up at the time of trial, but Imation never presented any
>> evidence to support these claims (having decided not to call an
>> Imation witness).
>
> Toshiba Opp. to Def.'s Motion . . . Regarding Inducement, dkt. 526, at 12.

This is a fair observation as far as it goes, but as defendants point out, it was not

Imation's burden to disprove inducement. Toshiba had the burden to establish each of the

elements of its claim that Imation induced infringement.  Absent any additional argument from

Toshiba explaining how the jury reasonably could have concluded from nothing more than

undated documents that Imation encouraged end users to finalize DVDs *after* it became aware

that finalization infringed the '751 patent, I conclude that Toshiba has failed to meet its burden

of showing that Imation induced infringement.

### 3.  Ritek

With respect to Ritek, Toshiba introduced a statement from its "FAQ" page on its

website. *See* Swoopes Decl., dkt. 527, Exh. N.  Ritek's corporate representative testified that the

webpage was up in 2009 and removed in 2010.  I agree with defendants that the removal of the

webpage means that there can be no liability against Ritek for induced infringement after the

date it was removed, even if the other elements of induced infringement had been met.  The remaining question is whether Toshiba presented sufficient evidence to show that, while the website was up, Ritek knew or was willfully blind to evidence establishing that an end user who finalized a DVD would infringe the patent.  I address this question in the next section.

### B.  Knowledge or Willful Blindness–Both Patents

Defendants contend that the evidence was insufficient to show that they knew or were willfully blind to the fact that end users would infringe the '966 when they recorded DVDs and that end users would infringe the '751 when they finalized DVDs.[9]  Defendants emphasize that to prove inducement, Toshiba had to show that each defendant knew, not just of the existence of the patents, but what acts infringed the patents.  Further, they argue, Toshiba had to establish *when* the defendants gained this knowledge, because to be liable for inducement, any encouraging statements had to have been made *after* defendants knew of the acts constituting infringement.  During its opening and closing arguments, Toshiba distinguished between defendants' pre-complaint and post-complaint knowledge; therefore, I will follow that approach here.

### 1.  Pre-Complaint

Toshiba argues that the it was reasonable for the jury to conclude that defendants knew of the acts constituting infringement after the defendants received the notice letters from DVD6C in the fall of 2003.  Like its presentation with respect to acts of inducement, Toshiba's

---

[9]  Toshiba argues that defendants cannot bring a Rule 50(b) motion with respect to the '966 patent because they did not preserve their arguments in their Rule 50(a) motion.  I disagree.  *See* Trial Tr. at 4-A-32:17-4-A-38:5,4-A-48:12-4-A-50:24.

argument regarding defendants' knowledge emphasizes the fact that defendants manufactured discs that they held out to be compliant with the DVD standards.  Toshiba's Br. in Opp., dkt. 526, at 11 ("After receiving the notice letters from DVD6C, all of the Defendants were aware that a license was required to make a recordable DVD that is standards-compliant and that encouragement of use of a recordable DVD in a standards-compliant manner would be encouraging infringement.").  Toshiba also points out that CMC and Ritek, *before* receiving the notice letters, already had taken licenses to the patents in suit with respect to DVD-ROM discs and; CMC and Ritek also were members of the DVD Forum that developed the standards, which sought to make recordable DVDs function like pre-recorded discs so they could be played on older players on the market.  From this evidence, Toshiba argues, the jury reasonably could infer that it was more likely than not that CMC and Ritek "understood that the same patents would need to be licensed for recordable DVDs."

With respect to Moser Baer, Toshiba points out that the jury heard evidence that Moser Baer actually approached DVD6C and held a meeting to discuss taking a portfolio license for recordable discs in 2002.  Moser Baer ultimately decided not to take a license because it did not like the pricing; when it later received the notice letter from DVD6C, Moser Baer's witness testified that the company "didn't bother to look at the list [of patents]."

Like its presentation with respect to acts of inducement, Toshiba's arguments—and the evidence it presented at trial—glides past a necessary evidentiary link.  It is not enough that defendants had knowledge that a license was required to practice the DVD standards: what defendants had to know was that "that the induced acts constitute patent infringement." In other words, the evidence had to support a reasonable inference that defendants were aware—or

39

had deliberately ignored facts that would have confirmed such awareness—that encouraging DVD users to record or finalize their DVDs would infringe the '966 patent or '751 patent.

The evidence adduced at trial does not support this inference. Every defendant, by its trial witnesses, denied having knowledge of the patents or what they claimed. Although the jury did not have to believe–and therefore could reject–this testimony, such a rejection, without more, does not prove knowledge or willful blindness. A jury finding that the defendants did not prove that they did not know what was in Toshiba's two patents is not the same as a jury finding that Toshiba *did* prove that the defendants *did* know what was in those patents. It was Toshiba's burden to establish this latter point. In addressing defendants' argument that Toshiba has not done so despite a jury verdict in Toshiba's favor, the court must view the evidence in light most favorable to Toshiba.

Toshiba did not produce evidence showing that the patents were in defendants' files or that anyone associated with defendants actually had reviewed the patents. What Toshiba established at trial was that defendants were aware of the DVD standards and were aware of DVD6C's corresponding portfolio of patents, which consisted of about 360 patents governing three categories of recordable discs. Is this awareness sufficient to support the jury's verdict?

Neither Toshiba nor DVD6C ever advised defendants of the scope or the claims of any of the patents, and neither Toshiba nor DVD6C ever alerted defendants that defendants were inducing infringement by encouraging recording or finalization. What they told defendants was that they–Toshiba and DVD6C–collectively owned a portfolio of patents "essential" to practicing the DVD standards and that defendants would need to license, either from the pool or its individual members, these patents in order to practice the standards. This evidence,

40

without more, falls short of showing that, after receiving the DVD6C letters, defendants knew that they would induce infringement of the '751 or '966 patents if they encouraged end users to record on or finalize the discs.

The fact that CMC and Ritek had obtained a portfolio license from DVD6C covering DVD-ROM technology, of which the patents in suit were listed as two among more than 100 essential patents, does not lend support to the jury's verdict. Notably, there is no evidence suggesting–or reasonably allowing the inference–that CMC and Ritek knew that those patents would apply to formats other than DVD-ROM, much less that they actually knew of the patents' coverage. Indeed, even DVD6C did not think the '751 patent was essential for any recordable disc formats except DVD-RAM. How could defendants have known something that Toshiba's own licensing agent did not? Absent evidence showing that defendants had read the patents in suit or were informed of their scope, there is insufficient circumstantial evidence to support an inference that, after receiving the DVD6C letters, the defendants had *actual* knowledge that the '751 and '966 patents would be infringed if end users recorded and finalized DVDs.

So, was this evidence sufficient to support a finding of willful blindness? Willful blindness is something more than negligence or even recklessness. It requires that the defendant take "deliberate actions to avoid confirming a high probability of wrongdoing," such that it "can almost be said that [he] actually [knew] the critical facts." *Global-Tech*, 131 S. Ct. at 2070-71. In other words, it is not enough that defendants could or even should have figured out, by reading the DVD standards and Toshiba's patents, that recording or finalizing a DVD would infringe the patents in suit. Instead, they had to have taken a "deliberate action" designed to

41

avoid confirming their own strong belief that they were inducing infringement.  In *Global-Tech*,
for example, the court found this standard was easily met where the evidence showed that the
accused infringer's CEO and president had failed to inform the lawyer from whom he sought a
right-to-use opinion that the product to be evaluated had been copied directly from the patent
holder's patented product.  131 S. Ct. at 2071.

Although Toshiba does not develop a separate willful blindness argument, I find no
evidence that would support a reasonable inference by the jury that any of the defendants
deliberately shielded itself from information that would confirm a high probability that it was
infringing Toshiba's two patents.  The only "deliberate" action to which Toshiba points is Moser
Baer's statement that it did not review the patent lists.  Fair enough.  It is reasonable to infer
from the evidence that Moser Baer–and each of the other defendants who received the letters–
chose *not* to cue up all 360 patents identified as applying to DVD-R, DVD-RW and DVD-RAM
discs in order to attempt, patent-by-patent, 360 times, to discern whether or how any of that
defendant's products might infringe that particular patent–or more specifically in this case, to
attempt to discern whether or how *end users* might infringe that particular patent by using
defendant's product in a certain manner after buying it.

Just framing this Augean exercise establishes how far from willful blindness it was for the
defendants to decline to undertake it.  DVD6C's indolent approach to seeking licenses foisted
all of the heavy lifting onto the recipients of its remarkably broad letters.  It is neither surprising
nor blameworthy that the recipients chose not to commit their resources to searching the 360-
patent haystack for needles that might–or might not–be there.  More to the point, a defendant's
choice not to scour thirty-dozen allegedly relevant but undifferentiated patents cannot be

characterized as a deliberate attempt to avoid confirming a high probability that that defendant's DVDs could be used to infringe any of the listed patents.

It is easy to envision a more tightly-targeted, informative warning letter that would have triggered a defendants' duty to investigate, but speculating about what DVD6C could have done is irrelevant. Giving the jury's verdict the high deference to which it is entitled, I conclude that the evidence establishes what the defendants *could* have known; at the outermost edge of the deference boundary, perhaps the evidence establishes that defendants *should* have known what the patents in suit covered, and that the acts by end users could infringe these patents. But *Global-Tech*, "should have known" is not enough. *Accord Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.*, 07-C-0391, 2011 WL 6122377, *7 (E.D. Wis. Dec. 8, 2011) ("Knowledge of a *risk* that the acts might constitute infringement is not enough; the inducer must *know* that the acts constitute infringement.") (emphasis in original).

In sum, I find the evidence adduced at trial was not sufficient to support the jury's verdict that defendants possessed the requisite intent to induce infringement of the patents-in-suit at any time before the suit was filed.[10]

## 2.  Post-Complaint

### a.  Lack of Evidence Concerning '751 Patent

Defendants also argue that, with respect to the '751 patent, they did not learn until some time *after* the complaint was filed that it was the act of finalization that Toshiba was claiming led to the writing of the test pattern and corresponding infringement of the patent. In both its

---

[10] Toshiba does not suggest and it did not argue to the jury that there were any dates between the fall of 2003 and the filing of complaint on which defendants acquired the necessary knowledge.

arguments to the jury and brief opposing the instant motion, Toshiba referred to the filing of the complaint as if it were self-proving that from that date forward the defendants had the requisite intent to induce infringement of both patents.

As defendants points out, however, Toshiba did not introduce the complaint into evidence. Therefore, the jury had nothing but the statements of Toshiba's lawyers from which to conclude that defendants were aware, after reading the complaint, that they were inducing infringement by encouraging end users to finalize DVDs. Attorney arguments are not evidence. Further, it is not at all clear from the complaint that Toshiba was accusing defendants of inducing infringement of the '751 patent by encouraging end users to finalize DVDs.

Toshiba did not offer any evidence or argument concerning a later date upon which the jury could find defendants gained the knowledge necessary to support a finding of inducement, but defendants concede that they had such awareness by the time Toshiba filed its motion for summary judgment in August 2010. Accordingly, I find that Ritek's period of liability for inducing infringement—should it ever come to vest—is limited to the time period between August 2010 and the date it removed the FAQ page from its website.

### b. Defenses to Infringement

Finally, defendants argue that they had meritorious defenses to Toshiba's infringement claims that trump any finding that they had the specific intent to induce infringement at any time after the complaint was filed. In particular, they argue that they had a reasonable, good faith belief that Toshiba's claims with respect to the '751 patent were exhausted by its licensing of the drives and a viable claims construction argument concerning the location of the lead-out

area that, if successful, would have defeated any claim of infringement.  As for the '966 patent, defendants argue that they had a good faith claims construction argument and a solid invalidity defense.  At the very least, assert defendants, they had a good faith belief that they were not inducing infringement of either patent between December 28, 2010, when this court granted their motion for summary judgment on both patents, and June 11, 2012, when the Federal Circuit reversed that decision.

In response, Toshiba first argues that "decisions that affect the substantive rights of defendants, such as claim construction rulings, are routinely made," yet "liability for induced infringement still reaches back to at least the filing of the complaint, if not earlier."  Toshiba's Br. in Opp., dkt. 526, at 13.  In support, Toshiba cites a number of cases, but none of these hold that induced infringement always reaches back to the filing of the complaint, notwithstanding the viability of an accused infringer's defense.  *Id*.  Whether a defendant had the intent to induce infringement is a question of fact to be gleaned from all the circumstances, including whether the defendant had a good faith belief that it was not infringing or the patent was invalid.  *Commil LLC, USA v. Cisco Systems, Inc.*, 720 F.3d 1361, 1367-68 (Fed. Cir. 2013) (good faith belief of invalidity is evidence that tends to show than accused inducer lacked into required to be held liable for induced infringement); *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 649 (Fed. Cir. 2011) (finding opinion of counsel regarding non-infringement "admissible, at least with respect to [defendant]'s state of mind and its bearing on indirect infringement"); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1351, *amended on reh'g in part*, 366 Fed. Appx. 154 (Fed. Cir. 2009) (finding that a reasonable belief of non-infringement supported a jury verdict that defendant lacked the intent required for induced infringement); *Kinetic Concepts, Inc. v. Blue Sky Med. Grp.*,

*Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009) (holding that defendant's "belief that it can freely practice inventions found in the public domain" supports "a jury's finding that the intent required for induced infringement was lacking").

In the cases cited by Toshiba, there were facts suggesting that the defenses were not genuine. In other cases, however, courts have held that a defendant's good faith belief, formed after the filing of the complaint, that his products did not infringe was sufficient to negate any finding of intent to induce infringement. *See, e.g., Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553-54 (Fed. Cir. 1990).

Alternatively, Toshiba argues that defendants waived their good-faith defense argument by failing to present evidence at trial that they relied on the advice of counsel. Although defendants insist that this is not what they are claiming, Toshiba's objection is understandable: all of the cases cited in defendants' brief involved an advice of counsel defense. *See DSU Med. Corp.*, 471 F.3d at 1307 (finding a demonstrated belief of non-infringement, based on advice of counsel, sufficient to support a jury verdict that the defendant did not induce infringement); *Manville*, 917 F.2d at 553 (evidence of record indicated that alleged infringer had good faith belief, based on the advice of counsel, that product did not infringe); *Goss International Americas, Inc. v. Graphic Management Associates, Inc.*, 739 F. Supp. 2d 1089, 1115-16 (N.D. Ill. 2010) (granting summary judgment of no inducement and not willful infringement where defendant relied on a draft non-infringement opinion letter from patent counsel); *VNUS Med. Technologies, Inc. v. Diomed Holdings, Inc.*, C-05-2972 MMC, 2007 WL 2900532, *1 (N.D. Cal. Oct. 2, 2007) (denying summary judgment of induced infringement where "each defendant has offered evidence that it sought and obtained the opinion of counsel, who, in each instance, provided an

46

opinion the accused products did not infringe and/or the patents were invalid; further, each defendant has offered evidence that in reliance on the opinion of its counsel, it continued to sell the accused products."); *Kolmes v. World Elastic Corp.*, 1995 WL 918081, *10 (M.D.N.C. Sept. 18, 1995), *aff'd sub nom. Kolmes v. World Fibers Corp.*, 107 F.3d 1534 (Fed. Cir. 1997) (finding defendants lacked specific intent to induce infringement where "[d]efendants consulted counsel and had a good faith belief in the invalidity of the 1948 patent, requesting reexamination by the PTO."). Here, defendants are not pointing to evidence indicating that they relied on the advice of counsel or even that they subjectively believed they had a good faith defense to infringement: instead, they are asking for a judicial determination that defendants could not have formed the specific intent to infringe because they had *objectively* reasonable defenses to infringement. None of the authorities cited in defendants' briefs involved a similar claim.

Indeed, in a recent case, the Federal Circuit held that although an accused inducer's good-faith belief of invalidity (or non-infringement) could negate the requisite intent for induced infringement, that determination is reserved for the fact finder:

> We now hold that evidence of an accused inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement. This is, of course, not to say that such evidence precludes a finding of induced infringement. Rather, it is evidence that should be considered by the fact-finder in determining whether an accused party knew "that the induced acts constitute patent infringement." *Global-Tech*, 131 S. Ct. at 2068.

*Commil*, 720 F.3d at 1368-69. Thus, although defendants are correct that their defenses are

47

relevant, I am not persuaded that a post-hoc judicial assessment of the reasonableness of those defenses is appropriate in an inducement case.[11]

As a practical matter, however, I do agree with defendants on one substantial point: no reasonable fact finder could find that defendants formed the requisite intent to induce infringement between the time this court ruled in their favor on summary judgment and the time the Federal Circuit reversed that decision. Absent some suggestion by Toshiba (and it has made none) that this court completely abdicated its duty to fairly and objectively resolve the parties' dispute on summary judgment such that no reasonable person could have relied on it, this court's judgment declaring that defendants did not directly, indirectly or contributorily infringe either of Toshiba's patents proves, as a matter of law, that they did not have the intent to

---

[11] I note that the Federal Circuit has endorsed the approach defendants are advocating in the context of assessing whether a defendant's infringement was "willful" so as to justify an award of enhanced damages under 35 U.S.C. § 284. *See In re Seagate Tech.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc) (requiring patentee to show that defendants acted "despite an objectively high likelihood that [their] actions constituted infringement of a valid patent"), and *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1005-06 (Fed. Cir. 2012) (citations omitted) (*Seagate*'s "objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to de novo review."). If an objectively reasonable defense to a charge of infringement is sufficient to defeat a showing of recklessness, and if willful blindness "surpasses recklessness," *Global-Tech*, 131 S. Ct. at 2070, then it would seem to follow that an objectively reasonable defense would also defeat a showing that a defendant "knew" or was willfully blind to such a "high probability of wrongdoing," such that he "can almost be said to have actually known the critical facts." In *Commil*, however, the Federal Circuit gave no indication that the determination whether an accused infringer had an objectively reasonable defense sufficient to negate any intent to induce was for the court, as opposed to the jury.

infringe during this time period.  Defendants simply could not have "known" that they were inducing infringement when they had a judicial declaration telling them that they weren't.[12]

### C.  Conclusion

To summarize, defendants' motion for JMOL with respect to induced infringement is granted in part and denied in part: with respect to the '751 patent, I am granting the motion in its entirety for defendants Moser Baer, CMC and Imation.  I am denying it as to defendant Ritek for the period from August 2010 to the date on which Ritek removed its FAQ page from its website; I am granting it in all remaining respects.

With respect to the '966 patent, I am granting the motion for the period prior to the filing of the complaint and for the time period between December 28, 2010 and June 11, 2012; I am denying it in all other respects.  I am denying as moot defendants' motion for a new trial.

### V.   Defendants' Rule 60 Motion for Relief from Judgment on Induced Infringement of the '751 Patent Based on New Authority Concerning Exhaustion (dkt. 534)

Finally, defendants move for reconsideration of this court's pretrial ruling that their exhaustion defense, based on Toshiba's alleged licensing of the DVD drives used to write the test pattern during the finalization process, failed as a matter of law.  Defendants' motion is based

---

[12]  The jury did not hear this evidence because this court denied defendants' request to present it.  Ord. on Mots. in Limine, dkt. 417, at 17-18. Technically, the court is not supposed to grant JMOL on the basis of evidence not presented to the jury; defendants' remedy would be a new trial.  However, I see no reason to order a new trial instead of JMOL where Toshiba has not disputed defendants' arguments concerning the effect of the summary judgment order on their state of mind or suggested that it has evidence to show that reliance on this court's order could not have been in good faith.  In any event, defendants' request for a new trial is moot unless the Federal Circuit reverses this court's determination on damages, which case the court likely will provide rulings and guidance on the various other disputed issues, including this one.

on the Federal Circuit's recent decision in the *Keurig* case, *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370 (Fed. Cir. Oct. 17, 2013). Defendants argue that the Federal Circuit's decision is a game-changer that provides the "clearer guidance" that this court found lacking when it ruled back in April. *See* Supp. Order Re: Motions in Limine, dkt. 455, April 5, 2013, at 7. According to defendants, the *Keurig* appellate decision establishes, as a matter of law, that Toshiba's right to assert infringement of the claims of the '751 patent against defendants was exhausted when end users purchased drives licensed under the '751 patent and subsequently used them to create finalized discs.

Although I agree that *Keurig* provides strong support for defendants' exhaustion defense and although it would be within my discretion to reconsider my ruling, *see Mendez v. Republic Bank*, 725 F.3d 651, 659 (7th Cir. 2013), I decline to do so. First, any such opinion would be in the nature of an advisory opinion, given that this court has already stricken Toshiba's damages case. Second, the parties are going to appeal this case no matter what, so no efficiencies stand to be gained by reconsideration. Finally, even reversal of my ruling on defendants' exhaustion defense would not be an automatic win for defendants on liability: at the very least, there appears to be a factual dispute concerning whether some end users use unlicensed drives. (Toshiba asserts that there are other disputed facts, such as whether the drives embody the technology claimed in the '751 patent) Resolving this and possibly other factual questions relevant to exhaustion will expend additional time and resources in a case that is otherwise decided and ready for appeal. For all these reasons, I conclude that it is more just and more efficient for defendants to argue the impact of the *Keurig* decision on appeal. Accordingly, I am denying their Rule 60(b) motion.

# ORDER

IT IS ORDERED that:

I.     Plaintiff Toshiba Corporations' motion for judgment as a matter of law regarding direct infringement of the '966 patent (dkts. **485** and **522**) is DENIED;

II.    Defendants' motion for judgment as a matter of law and alternative motion for a new trial (dkt. **518**) regarding anticipation is DENIED;

III.    Defendants' motion for judgment as a matter of law on the question of pre-suit damages (dkt. **516**) is GRANTED;

IV.    Defendants' motion for judgement as a matter of law regarding induced infringement of both the '751 and '966 patents (dkt. **520**) is GRANTED IN PART and DENIED IN PART, in the manner and for the reasons set forth above at 32-49; defendants' alternative motion for new trial under Rule 59, is DENIED as MOOT; and

V.    Defendants' Rule 60(b) motion concerning exhaustion of the '751 patent (dkt. **534**) is DENIED.

Entered this 31ˢᵗ day of December, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

51